UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| AARON WALTON on behalf of Plaintiff and the class members described below, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 1:23-cv-00520-SEB-TAB |
| UPROVA CREDIT LLC, UPROVA HOLDINGS LLC, UPPER LAKE PROCESSING SERVICES, INC., POMO ONE MARKETING INC., HABEMCO LLC, GENEL ILYASOVA, MICHAEL SCOTT HAMMER, DENISE DEHAEMERS, SARAH MARIE HIMMLER, DAVID STOVER, JOHN DOES 1-20, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTION TO COMPEL ARBITRATION**

This matter comes before the Court on Defendants' Uprova Credit LLC ("Uprova Credit"), Uprova Holdings LLC ("Uprova Holdings"), Upper Lake Processing Services, Inc. ("Upper Lake Processing"), Pomo One Marketing, Inc. ("Pomo One Marketing"), Habemco LLC ("Habemco"), Genel Ilyasova, Michael Scott Hammer, Denise Dehaemers, Sarah Maria Himmler, and David Stover (collectively as "Defendants") Motion to Compel Arbitration, dkt. 20. For the reasons stated herein, the Defendants' motion is **GRANTED**.

1

## FACTUAL BACKGROUND

Uprova Credit is an online lender wholly owned and operated by the Habematolel Pomo of Upper Lake, California (the "Tribe"), a federally recognized Indian tribe. Through the website www.uprova.com, Uprova Credit offers loans to consumers.

Other Defendants are entities, vendors, or service providers affiliated with Uprova Credit and are also wholly owned and operated by the Tribe. According to the Complaint, Uprova Holdings provides marketing services, among others, necessary for internet lending purposes. Upper Lake Processing provides support and processing services, such as customer verification, customer service, call center operations, and collection services, to Uprova Credit and other online lenders. Pomo One Marketing generates leads for www.uprova.com, and Habemco[1] assists in the website's operation.

The individual Defendants are employees, agents, representatives, officers, and/or managers of Habemco and Upper Lake Processing Services: Genel Ilyasova is Vice President of Partner Relations for Pomo One Marketing; Sarah Marie Himmler is a managing agent of Uprova Holdings; Michael Scott Hammer is an attorney and chief compliance officer at Habemco; Denise DeHaemers is Legal Department Operations Manager at Habemco; and David Stover is the vice president of Call Center Operations at Upper Lake Processing. The Complaint avers that none of these individually named Defendants are members of the Tribe.

---

[1] According to Defendants, Habemco is formerly known as Uprova Holdings. Treppa Decl. ¶ 8, dkt. 21-1 (Sherry Treppa is Chairperson of the Board and President of Uprova Credit, Habemco (formerly known as Uprova Holdings), Upper Lake Processing Services, and Pomo One Marketing, authenticating the Loan Agreement).

On October 5, 2022, Plaintiff Aaron Walton ("Mr. Walton") obtained a loan through www.uprova.com for $1,100.00 at an interest rate of 335.43 percent. Compl. ¶ 24, dkt. 1. Mr. Walton has made payments on his loan (including interest), but Defendants claim that amounts due and owing are still outstanding.

The terms of Mr. Walton's loan were memorialized on a standard loan agreement template, a copy of which Mr. Walton attached to the Complaint (hereinafter referred to as the "Loan Agreement).[2]

This Loan Agreement provides that, "[a]s an economic arm of the Tribe, Uprova Credit, LLC., possesses sovereign immunity which will limit any actions, if any, you may bring in a dispute." Dkt. 1-1 at 5. However, Uprova Credit did stipulate "a limited waiver of its sovereign immunity only as set forth" in the agreement to arbitrate contained therein. *Id.*

The Loan Agreement also spells out the "Governing Law":

> You agree that this Agreement and all aspects of your loan and your relation-ship with us including all claims or causes of action (contract, tort, equity, statutory or otherwise) shall be subject to, and governed by and enforced in accordance with the laws of the Tribe and applicable U.S. federal law (col-lectively, the "Governing Law"). By agreeing to this governing law provi-sion, you acknowledge and agree that the laws of the Tribe rather than the laws of your state or any other state will apply. Nothing in this Loan Agree-ment shall be interpreted to (i) waive any rights you have under U.S. federal law or (ii) prevent you from bringing any individual Claim against us under

---

[2] We properly consider the contents of the Loan Agreement, as it is both central to Mr. Walton's Complaint and has been authenticated by Defendants. *See generally* dkt. 1-1; Treppa Decl. at 2, dkt. 21-1; *Mueller v. Apple Leisure Corp.*, 880 F.3d 890, 895 (7th Cir. 2018) (explaining that docu-ments attached to the complaint and motions to dismiss "are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim.") (internal citations and quotations omitted); *Deb v. SIRVA, Inc.*, 832 F.3d 800, 809-10 (7th Cir. 2016); *Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 810 (7th Cir. 2011).

U.S. federal law, subject to the Arbitration Agreement's prohibition of a jury trial, class actions, class arbitration, and injunctive relief in favor of non-parties.

*Id.*

Another provision of the Loan Agreement provides that "any disputes regarding this [Loan] Agreement will be decided pursuant to the terms set forth in the Binding Confidential Arbitration Agreement, Class Action Waiver and Jury Trial Agreement below ("the Arbitration Agreement") unless you timely opt out of such process as set forth below." *Id.* at 7.

The Arbitration Agreement, as incorporated in the Loan Agreement, provides the following substantive provisions:

> **Agreement to Arbitrate.** You and we agree to arbitrate all disputes and claims through confidential binding individual arbitration, including all claims regarding the validity, scope, or enforceability of this Arbitration Agreement.
>
> ***
>
> **What is Covered.** All claims asserted by us against you or your heirs, successors, representatives, or assignees. All claims asserted by you against us and/or any of our direct or indirect parent companies or entities, affiliated entities, vendors, or service providers, and each of their employees, agents, representatives, directors, officers, shareholders, governors, managers, members, and other affiliated persons (hereinafter collectively referred to as "related third parties"), including, without limitation, claims for money damages and/or equitable or injunctive relief.
>
> ***
>
> **What Law Applies to This Arbitration Agreement.** This Arbitration Agreement involves interstate commerce. It shall be governed by and subject to the FAA for all purposes. The Arbitrator shall decide all issues arising under or relating to the Loan Agreement, as described above, including all

4

claims regarding the validity, scope, or enforceability of this Arbitration Agreement, in accordance with the Governing Law.

*Id.* at 7–8.

Claimants asserting claims against Defendants retain "the right to choose between the American Arbitration Association . . . or JAMS . . . to administer arbitration." *Id.* at 8. They may also elect to participate in arbitration via telephone or some "other mutually agreed upon electronic platform" or may request in-person arbitration at a location within thirty miles of their residence. *Id.* At the conclusion of arbitration proceedings, claimants may enter the final arbitration award in their "choice of either Tribal Court or the United States District Court for the judicial district in which [they] reside." *Id.* at 10.

On March 24, 2023, Mr. Walton filed this putative class action, pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), alleging joint and several liability against all Defendants for their participation in a predatory and unlawful lending scheme that tenders short-term online installments loans to Indiana residents at interest rates well above the 36 percent statutory cap. Ind. Code § 24-4.5-3-508. Mr. Walton contends that, despite Defendants' nominal affiliation with the Tribe, "virtually all business functions occur far from tribal land, by non-tribal members, and overwhelmingly benefit non-tribal members." Compl. ¶ 42, dkt. 1. He alleges further that Defendants are not bona fide "arms of the Tribe," meaning they are not entitled to the protections of tribal sovereign immunity. *Id.* ¶ 39, 43. Mr. Walton seeks money damages pursuant to the Indiana Uniform Consumer Credit Code ("IUCCC") and the Racketeer Influenced and Corrupt Organizations Act ("RICO").

On May 18, 2023, Defendants moved to compel arbitration and dismiss this action, pursuant to the Federal Arbitration Act, 9 U.S.C. § 1. Dkt. 20.[3] That motion is fully briefed and ripe for ruling.

## LEGAL STANDARD

The Federal Arbitration Act ("FAA") embodies "both a liberal federal policy favoring arbitration . . . and the fundamental principle that arbitration is a matter of contract." *Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 710 (7th Cir. 2019) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)). Indeed, the FAA regards written arbitration agreements as "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract . . . ." 9 U.S.C. § 2. Thus, when presented with a valid arbitration agreement, "the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." *Id.* § 4. Courts must grant a motion to compel arbitration where there is (1) a written agreement to arbitrate, (2) a dispute within the scope of the agreement to arbitrate, and (3) a refusal to arbitrate. *Zurich Am. Ins. Co.*, 417 F.3d 682, 687 (7th Cir. 2005) (citing 9 U.S.C. § 4).

---

[3] In passing, Defendants attribute the *forum non conveniens* doctrine as the procedural basis of their motion to compel arbitration, but, as the Seventh Circuit has repeatedly cautioned, "it is the substance of a motion that counts, not its label." *Brickstructures, Inc. v. Coaster Dynamix, Inc.*, 952 F.3d 887, 890 (7th Cir. 2020). Despite a handful of cursory references to *forum non conveniens*, the substantive basis of Defendants' argument is the Federal Arbitration Act. We, therefore, construe their motion accordingly. *See* 9 U.S.C. § 4 ("The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.").

The party seeking to compel arbitration bears the burden of demonstrating a valid agreement to arbitrate. *A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1063 (7th Cir. 2018). In evaluating an arbitration agreement, courts may properly consider relevant exhibits and affidavits. *Reineke v. Circuit City Stores, Inc.*, 2004 WL 4426239, at *1 (N.D. Ill. 2004). Once the moving party satisfies its initial burden, the nonmoving party must identify a triable issue of fact, much like the nonmoving party's burden on a motion for summary judgment. *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002). The nonmoving party "cannot avoid compelled arbitration by generally denying the facts upon which the right to arbitration rests; the party must identify specific evidence in the record demonstrating a material factual dispute for trial." *Id.* Courts view the evidence in the light most favorable to the nonmoving party and draw reasonable inferences in its favor. *Id.* If the nonmoving party identifies a triable issue of fact, "the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4.

## DISCUSSION

Here, Mr. Walton disputes neither the existence of the Arbitration Agreement nor his own refusal to arbitrate. *Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 702 (7th Cir. 2022). Thus, only the question of arbitrability remains. We address the parties' arguments below.

### I.   Delegation Clause

The arbitrability inquiry, *i.e.*, whether the dispute falls within the arbitration agreement's scope, is ordinarily "an issue for judicial determination[,] [u]nless the parties clearly and unmistakable provide otherwise." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986). Through the inclusion of a delegation clause, parties may

7

manifest such clear and unmistakable intent "to have an arbitrator decide not only the merits of a particular dispute but also gateway questions of arbitrability, such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (internal quotation marks and citations omitted); *accord United Nat. Foods, Inc. v. Teamsters Loc. 414*, 58 F.4th 927, 933–34 (7th Cir. 2023). A delegation clause is, in Supreme Court parlance, "simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 70 (2010). Thus, if a valid arbitration agreement exists, and "the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Henry Schein*, 139 S. Ct. at 530.

Clear and robust language may, in and of itself, sufficiently demonstrate the requisite intent to delegate arbitrability questions to an arbitrator. *Rent-A-Center*, 561 U.S. at 69 n.1 (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938 944–45 (1995)). Additionally, the reference to or incorporation of the rules and procedures of the American Arbitration Association (the "AAA") and/or JAMS may constitute clear and unmistakable evidence of a delegation clause. *Gilman v. Walters*, 61 F. Supp. 3d 794, 801 (S.D. Ind. 2014). Under both bodies of arbitration rules and procedures, the arbitrator retains explicit authority to resolve arbitrability disputes. AAA Consumer Arb. R. 14 ("The arbitrator shall have the power to rule on . . . any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."); JAMS Arb.

R. 11(b) ("The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter."). Though the Seventh Circuit has not yet fully endorsed this view, most federal courts (including various district courts within this Circuit) agree on the matter. We, too, hereby adopt and apply the majority view. *Gilman*, 61 F. Supp. 3d at 801; *Grabowski v. PlatePass, L.L.C.*, No. 20 C 7003, 2021 WL 1962379, at *3 (N.D. Ill. May 17, 2021) (collecting cases).

Still, if a party specifically challenges a delegation clause, the court must evaluate the validity of the delegation before ordering compliance with the agreement. *Rent-A-Center*, 561 U.S. at 71. Likewise, a party may contest the enforceability of a delegation clause on the same grounds as it contests the arbitration agreement writ large. *See id.* at 72–74.

Here, the Arbitration Agreement at issue subjects "all disputes and claims . . . , including all claims regarding [its] validity, scope, or enforceability" to "confidential binding individual arbitration." Dkt. 1-1 at 7. In another paragraph, the Arbitration Agreement specifies that an arbitrator "shall decide all issues arising under or relating to the Loan Agreement . . . , including all claims regarding the validity, scope, or enforceability of this Arbitration Agreement, in accordance with the Governing Law." *Id.* at 8. Consistent with holdings by other federal district courts, we find that this language constitutes clear and unmistakable evidence of a delegation clause. *E.g.*, *Harris v. FSST Management Services, LLC*, No. 22-C-1063, 2023 WL 5096295, at *2 (N.D. Ill. Aug. 10, 2023); *Kemph v. Reddam*, 2015 WL 1510797, at *4 (N.D. Ill. Mar. 27, 2015) (collecting cases).

Moreover, the Arbitration Agreement incorporates the AAA and JAMS rules and procedures, lending further support to our conclusion that the parties intended to delegate

the issue of arbitrability to an arbitrator. Specifically, the Arbitration Agreement provides that, "[r]egardless of who demands arbitration, [the borrower] ha[s] the right to choose between the American Arbitration Association . . . or JAMS . . . to administer the arbitration." Dkt. 1-1 at 8. The arbitration will then "proceed according to the rules and procedures used by the applicable arbitration organization for consumer disputes, to the extent those rules and procedures do not contradict the express terms of this Arbitration Agreement." *Id.* at 9.

Together, the Arbitration Agreement's unambiguous language and its references to the AAA and JAMS lead us to conclude that the parties have, indeed, delegated the issue of arbitrability to an arbitrator. However, Mr. Walton contends that, apart from the delegation clause issues, it as well as the Arbitration Agreement in its entirety are unenforceable because they operate "as a prospective waiver of his right to vindicate his federal and state statutory rights and remedies." Pl.'s Resp. 4, dkt. 32. This challenge to the delegation clause by Mr. Walton is sufficiently specific that the Court must, and therefore does, consider the merits. *Rent-A-Center*, 561 U.S. at 71.

## II.   Prospective Waiver

Despite the FAA's broad mandate, the Supreme Court has "expressed a willingness to invalidate, on 'public policy' grounds, arbitration agreements that 'operat[e] . . . as a prospective waiver of a party's *right to pursue* statutory remedies." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 235 (2013) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 (1985)) (alterations and emphasis in original).

The so-called prospective waiver rule[4] emerged out of judicial efforts to "harmonize competing federal policies"—*i.e.*, where enforcing arbitration agreements under the FAA thwarts the enforcement of other federal law and policy. *Id.* The Supreme Court has explained that arbitration must, at bottom, preserve litigants' ability to pursue statutory remedies so that "the statute will continue to serve both its remedial and deterrent function." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991) ("The Sherman Act, the Securities Exchange Act of 1934, RICO, and the Securities Act of 1933 are all designed to advance important public policies, but . . . claims under those statutes are all appropriate for arbitration.").

In dicta, the Supreme Court continues to acknowledge the prospective waiver rule yet has "declined to apply it to invalidate the arbitration agreement at issue." *Italian Colors*, 570 U.S. at 235 (citing *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 273–74 (2009); *Gilmer*, 500 U.S. at 28). Nevertheless, as the Court has explained, the prospective waiver rule "would certainly cover a provision in an arbitration agreement forbidding the assertion of certain statutory rights." *Id.* at 236.

In the tribal lending context, the Seventh Circuit has not previously evaluated the enforceability of delegation and arbitration provisions; however, the Second, Third, and Fourth Circuits, as well as another district court within the Seventh Circuit, have all rejected "arbitration agreements that limit a party's substantive claims to those under tribal law . . . [and] forbid federal claims from being brought." *Williams v. Medley Opportunity*

---

[4] The prospective waiver rule is sometimes referred to as the "effective vindication" exception.

*Fund II, LP*, 965 F.3d 229, 238 (3d Cir. 2020); *e.g.*, *Hengle v. Treppa*, 19 F.4th 324, 339 (4th Cir. 2021); *Gingras v. Think Finance*, 922 F.3d 112, 117 (2d Cir. 2019); *Harris*, 2023 WL 5096295, at *3. *Cf. Smith v. Bd. of Directors of Triad Mfg., Inc.*, 13 F.4th 613, 615, 621 (7th Cir. 2021) (applying prospective waiver in ERISA context and concluding that arbitration agreement that prohibited relief explicitly permitted by federal statute was un-enforceable). The loan agreements at issue in those tribal lending cases contained arbitration agreements, delegation clauses, and choice-of-law provisions that, taken together, operated as prospective waivers of a party's opportunity to vindicate federal rights. Though the specific loan provisions in the instant matter differ in some respects, the rulings in these cases have guided our analysis below.

"A foreign choice of law provision, of itself, will not trigger application of the prospective waiver doctrine." *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 334 (4th Cir. 2017); *see also DIRECTV, Inc. v. Imburgia*, 577 U.S. 47, 53 (2015) ("In principle, [contracting parties] might choose to have portions of their contract governed by the law of Tibet" or even "the law of pre-revolutionary Russia . . . ."). Rather, we "first examine whether, as a matter of law, the choice-of-forum and choice-of-law clauses operate in tandem as a prospective waiver of a party's right to pursue statutory remedies." *Gibbs v. Haynes Investments, LLC*, 967 F.3d 332, 340 (4th Cir. 2020) (quoting *Dillon*, 856 F.3d at 334). Typically, courts refuse to enforce arbitration agreements containing a choice-of-law provision that "limit[s] a party's substantive claims to those under tribal law," thus precluding a party from pursuing federal claims in arbitration. *Hengle*, 19 F.4th at 335; *accord Williams*, 965 F.3d at 238; *Gingras*, 922 F.3d at 126–28.

12

"When there is uncertainty whether the foreign choice of law would preclude otherwise applicable federal substantive statutory remedies, the arbitrator should determine in the first instance whether the choice of law provision would deprive a party of those remedies." *Id.* (internal citations omitted); *see also Moses H. Cone*, 460 U.S. at 24–25 (directing that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration"). By contrast, "where there is no uncertainty about the effect of the[ ] choice-of-law provisions, [we] may properly conclude the delegation provision—and thus the arbitration agreement—is unenforceable." *Hengle*, 19 F.4th at 335; *accord Dillon*, 856 F.3d at 334.

In some instances, the exclusion of federal law is facially apparent, leaving no doubt that the arbitration agreement is unenforceable as a prospective waiver of federal rights. For example, in *Hayes*, the Fourth Circuit concluded that an arbitration agreement excluding the application of "any law other than" tribal law "almost surreptitiously waive[d] a potential claimant's federal rights through the guise of a choice of law clause." 811 F.3d 666, 675 (4th Cir. 2016). Similarly, in *Dillon*, the Fourth Circuit held that the prospective waiver rule rendered unenforceable an arbitration agreement, which stated that the borrower "agree[d] that no other state or federal law or regulation shall apply to this [a]greement, its enforcement[,] or interpretation" and, in another clause, that the "inclusion of these disclosures does not mean that we . . . consent to application of state or federal law to us, the loan, or this [a]greement." 856 F.3d at 335–36. There, the court reasoned that these provisions "evince[d] an explicit attempt to disavow the application of federal or state law" and, thus, were unenforceable for public policy concerns. *Id.*

13

Other times, the exclusion of federal law is less readily apparent from the face of an arbitration agreement. For instance, in *Gibbs v. Sequoia Capital Operations, LLC*, the disputed arbitration agreement specified the application of tribal law and mandated that the arbitrator's decision remain "consistent with [t]ribal law," subject to tribal court judicial review. 966 F.3d 286, 293 (4th Cir. 2020). The Fourth Circuit explained that, "[a]lthough such provisions do not explicitly disclaim the applicability of federal law, they mandate the primacy and effective control of tribal law in resolving disputes." *Id*. In accord with its precedent, the Fourth Circuit in *Hengle* concluded that a "clause prohibiting application of 'any other law,' in tandem with . . . clauses requiring the arbitrator to apply tribal law," effectively dictated the "exclusive application of tribal law in arbitration." 19 F.4th at 339. Even without an explicit disavowal of federal law, "the practical effect [wa]s the same." *Id.* (internal quotation marks and citation omitted).

Here, Mr. Walton argues that the delegation clause is unenforceable because the Governing Law provision would require the arbitrator to evaluate arbitrability "without access to [the] federal or state laws 'necessary to make that determination.' " Pl.'s Resp. 7, dkt. 32 (quoting *Hengle*, 19 F.4th at 339). That is not what the Agreement provides, however. In relevant part, the Governing Law clause expressly incorporates "the laws of the Tribe and applicable U.S. federal law." Dkt. 1-1 at 5, 8. Further, the Governing Law provision states that "[n]othing in this Loan Agreement shall be interpreted to (i) waive any rights you may have under U.S. federal law or (ii) prevent you from bringing any individual [c]laim against us under U.S. federal law . . . ." *Id.* at 5.

14

We conclude therefore that the Governing Law provision does not—either explicitly or implicitly—prospectively waive Mr. Walton's federal rights, and, consequently, it is enforceable. Unlike the agreements in *Hayes* and *Dillon*, the Arbitration Agreement before us contains no disclaimer of federal law. Quite the opposite, it expressly *preserves* access to federal law in arbitration. Likewise, the Arbitration Agreement does not implicitly waive Mr. Walton's federal rights and remedies. Whereas the application of federal law in *Gibbs* and *Hengle* was couched in qualifying phrases, the application of federal law here is unequivocal: "Nothing in this Loan Agreement shall be interpreted to . . . waive any rights you may have under U.S. federal law." The Governing Law provision, which applies to the Loan and Arbitration Agreements, repeats the applicability of federal law, and, as such, reaffirms that the Agreements are subject to the laws of the United States. Put simply, the plain language reveals neither waiver nor disavowal of federal law and, accordingly, cannot fairly be construed as prospectively waiving a potential claimant's statutory rights and remedies.[5]

Mr. Walton directs us to *Harris v. FSST Management Services, LLC*, a case recently decided by a sister court in the Northern District of Illinois. No. 22-C-1063, 2023 WL

---

[5] We recognize that "courts generally . . . should apply ordinary state-law principles" when evaluating arbitration agreements under the FAA. *First Options*, 514 U.S. at 944. Here, however, neither party has engaged a choice-of-law analysis to direct us to the underlying body of contract law. Similarly, though the Governing Law clause provides for Tribal law, neither party cites any pertinent Tribal law provisions. Given that speculation is never grounds to invalidate an arbitration agreement, we cannot opine on the sufficiency of Tribal contract law where none has been provided to us. At bottom, the Governing Law clause preserves Mr. Walton's access to federal law, and, at this preliminary juncture, that is all that matters. Subsequent choice-of-law inquiries, including considerations regarding the adequacy of Tribal law, have not been briefed before us and, to that end, remain a subject for arbitration.

5096295 (N.D. Ill. Aug. 10, 2023). In that case, the loan agreement provided for the application of tribal law to the exclusion of state law, and, except for a passing reference to the FAA, spoke nothing about the application of federal law. However, the agreement also limited arbitration award enforcement to the non-appealable judgment of a tribal court, which could, "for 'any reason' determine [that] the FAA does not apply," thus "trigger[ing] the application of tribal law." *Id.* at \*3. The court held that the agreement impliedly waived the plaintiff's rights, reasoning that the agreement "allows tribal courts to apply tribal law to an arbitration award in every instance," without recourse to federal law. *Id.*

Unlike in *Harris*, the Governing Law provision before us expressly preserves federal statutory rights. The Arbitration Agreement also authorizes a claimant's right to appeal, "pursuant to the AAA's Optional Appellate Arbitration Rules or the JAMS Optional Arbitration Appeal Procedures," with the option to select "Tribal Court or the United States Court for the judicial district in which" the claimant resides." Dkt. 1-1 at 9–10. Where the tribal courts in *Harris* could find the FAA inapplicable for "any reason," the Arbitration Agreement here affords Tribal Courts no such discretion. Therefore, we find *Harris* easily distinguishable from the case at bar, as the Governing Law provision safeguards federal law.

Notwithstanding the Arbitration Agreement's preservation of federal law, Mr. Walton contends that the wholesale disclaimer of state law, in and of itself, renders the delegation clause unenforceable under the prospective waiver rule. Though we recognize the absence of precedential authority (both binding and persuasive) on this issue and the lack of uniform outcomes among district courts, we ultimately remain unpersuaded that the

16

prospective waiver doctrine was intended to preserve state statutory rights. *Compare Ferguson v. Corinthian Colls., Inc.*, 733 F.3d 928, 936 (9th Cir. 2013) (prospective waiver does not extend to state statutes), *and Johnson v. Opportunity Fin., LLC*, No. 3:22-cv-190, 2023 WL 2636712, at *5–6 (E.D. Va. Mar. 24, 2023) (prospective waiver rule applies only to disclaimer of federal law), *with Fitzgerald v. Wildcat*, No. 3:20-CV-00044, 2023 WL 5345302, at *9–10 (W.D. Va. Aug. 18, 2023) (prospective waiver of state substantive rights found unenforceable).

The tribal lending decisions of the Second, Third, and Fourth Circuits have never recognized this distinction between federal and state law—but we are not convinced, in any event, that such a distinction would necessarily alter their outcomes, as those arbitration agreements did "renounce the authority of the federal statutes to which [they were] and must remain subject." *Hayes*, 811 F.3d at 675. The primary concern in the other tribal lending decisions was "whether the arbitration provision[s] impermissibly waive[d] federal substantive rights without recourse to federal substantive law." *Hengle*, 19 F.4th at 338; *e.g.*, *Gibbs*, 967 F.3d at 340 ("But where an arbitration agreement prevents a litigant from vindicating federal substantive rights, courts will not enforce the agreement."); *Williams*, 965 F.3d at 238 ("The prospective waiver doctrine in the arbitration context refers to a situation in which the parties agree that, if disputes arise between them, then they waive the right to rely on federal law."). None of these decisions stands for the proposition that disclaiming state law necessarily renders an arbitration agreement unenforceable.

Extending the prospective waiver rule to state law claims is, in our view, incompatible with the rule's purpose. The prospective waiver rule rests on the uncontested

17

understanding that, in crafting the FAA, Congress did not intend to preempt rights created by other federal statutes. *See Mitsubishi Motors*, 473 U.S. at 628 ("Having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue."). Because the FAA stands on equal footing with other federal statutes, the prospective waiver rule becomes relevant only where compelling arbitration, as the FAA instructs, simultaneously jeopardizes federally protected interests. *See Stutler v. T.K. Constructors, Inc.*, 448 F.3d 343, 346 (6th Cir. 2006) (limiting application of prospective waiver rule to claims involving federal statutory claims). We, therefore, find it unsurprising that the Supreme Court has never invoked the prospective waiver doctrine in cases involving state statutory claims. *Italian Colors*, 570 U.S. at 235–36 (Sherman Act); *14 Penn Plaza*, 556 U.S. at 273–74 (Age Discrimination in Employment Act of 1967 ("ADEA")); *Gilmer*, 500 U.S. at 28 (ADEA); *Mitsubishi Motors*, 473 U.S. at 637 (Sherman Act).

Mr. Walton attempts to invoke *Viking River Cruises, Inc. v. Moriana* for the proposition that the Supreme Court has condoned the application of the prospective waiver rule to claims arising under state law. 596 U.S. 639, 653 n.5 (2022), *reh'g denied*, 143 S. Ct. 60 (2022). In that decision, the Court characterized as "erroneous" the petitioner's argument "that the principle that the FAA does not mandate enforcement of provisions waiving substantive rights is limited to federal statutes." *Id.* Stripped of its context, this footnote would surely lend itself to Mr. Walton's portrayal. However, nowhere in the *Viking River*'s decision did the Court mention the prospective waiver doctrine (or its alternative namesake, the effective vindication exception). To the contrary, the Court simply reiterated that "by

18

agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in the arbitral forum." *Id.* at 653 (cleaned up). In other words, substantive statutory rights—whether they be federal or state—are not nullified simply by virtue of their resolution in an arbitral, rather than a judicial, forum.

More relevant to the case at bar is the holding in *Italian Colors*, where the Supreme Court upheld arbitration agreements that precluded class arbitration of federal antitrust claims, despite the allegation that individual claims were not worth the expense involved in proving them. 570 U.S. at 235. The Court explained that "the fact that it is not worth the expense involved in *proving* a statutory remedy does not constitute the elimination of the *right to pursue* that remedy." *Id.* (emphasis in original). Though Justice Kagan rejected the majority opinion's narrow interpretation of the prospective waiver rule, she, too, affirmed that the rule has no bearing on the vindication of state law, writing:

> We have no earthly interest (quite the contrary) in vindicating [state] law. Our effective-vindication rule comes into play only when the FAA is alleged to conflict with another *federal* law, like the Sherman Act here. In that all-federal context, one law does not automatically bow to the other, and the effective-vindication rule serves as a way to reconcile any tension between them.

*Id.* at 252 (emphasis in original) (Kagan, J., dissenting); *see also Torres v. CleanNet, U.S.A., Inc.*, 90 F. Supp. 3d 369, 377 (E.D. Pa. 2015) (finding that "there is absolutely no rule that prevents arbitration when a person cannot effectively vindicate his or her state statutory rights."). Rather, when compelling arbitration under the FAA conflicts with state law, standard preemption principles dictate that federal law must prevail. *AT & T Mobility*

*LLC v. Concepcion*, 563 U.S. 333, 341 (2011); *e.g.*, *Viking River Cruises*, 596 U.S. at 635 (FAA preempted state law that was procedurally incompatible with arbitration).

In light of these controlling principles, we disagree with Mr. Walton that the disclaimer of state law renders the delegation clause unenforceable under the prospective waiver rule. No fair reading of the rule's purpose, nor of Supreme Court caselaw, supports such a conclusion. The delegation clause at issue here repeatedly affirms the applicability of federal law and therefore contains no waiver of federal rights. By that measure, the delegation clause is enforceable.

Insofar as any uncertainty remains regarding whether the foreign choice of law precludes federal remedies, we heed the Supreme Court's admonition against "invalidat[ing] arbitration agreements on the basis of speculation." *14 Penn Plaza*, 556 U.S. at 274; *Moses H. Cone*, 460 U.S. at 24–25 (directing that any doubts be resolved in favor of arbitration). Likewise, our ruling today reserves the pertinent choice-of-law inquiry for the arbitrator, as well as Mr. Walton's unconscionability arguments. Any further judicial involvement must await the outcome of the arbitration of these threshold matters, as provided in the Loan and Arbitration Agreements.

## III.   Stay of Proceedings

In addition to an order compelling arbitration, Defendants seek dismissal of these proceedings. However, "when an arbitrable issue arises in the course of a federal suit," the "normal procedure" is not to dismiss the action, but rather to issue a stay. *Tice v. Am. Airlines, Inc.*, 288 F.3d 313, 318 (7th Cir. 2002). Indeed, Section 3 of the FAA is unequivocal:

District courts "*shall . . .* stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3 (emphasis added).

We recognize that a growing number of courts have adopted a judicially-created exception to the general rule, which permits district courts, in their discretion, to dismiss an action rather than stay it where "it is clear that, after arbitration has concluded, no claims will remain for the court to resolve." *Int'l Bhd. of Elec. Workers, Loc. 1393 v. Carroll White Rural Elec. Membership Corp.*, No. 1:20-cv-1689-JMS-TAB, 2020 WL 5544021, at *9 (S.D. Ind. Sept. 19, 2020). However, neither the Seventh Circuit nor the Supreme Court has sanctioned this approach, and we are unpersuaded that deviating from Section 3's un-ambiguous directive is appropriate here.[6]

Even if the FAA authorized such an exercise of judicial discretion, it is unclear, at this stage in the proceedings, whether arbitration will resolve all of Mr. Walton's claims. To the contrary, the question for the arbitrator is whether Mr. Walton's claims are, in fact, arbitrable. It is impossible to determine at this stage of the case whether arbitration will resolve all claims. Therefore, we shall stay these proceedings "to spare the parties the bur-den of a second litigation should the arbitrators fail to resolve the entire controversy." *Tice*, 288 F.3d at 318.

---

[6] In January 2024, the Supreme Court granted certiorari to decide this exact issue. *Forrest v. Spiz-zirri*, 62 F.4th 1201 (9th Cir. 2023), *cert. granted sub nom. Smith v. Spizzirri*, No. 22-1218, 2024 WL 133822 (U.S. Jan. 12, 2024) (Question presented: Whether Section 3 of the FAA requires district courts to stay a lawsuit pending arbitration, or whether district courts have discretion to dismiss when all claims are subject to arbitration.). As of the date of this Entry, the matter remains pending.

## CONCLUSION

For the reasons explicated above, we hold that the delegation clause in the Arbitration Agreement at issue is enforceable because it does not prospectively waive Mr. Walton's recourse to any of his rights under federal law. Accordingly, Defendants' Motion to Compel Arbitration is **GRANTED**. Dkt. 20. This case is **STAYED** pending resolution of the arbitration proceedings. 9 U.S.C. § 3.

Additionally, it has come to the Court's attention that Defense Counsel Paul Croker's contact information still does not match the attorney record information in our CM/ECF system. Despite the Court's entry on April 19, 2023, informing Mr. Crocker of his responsibility to correct his contact information, pursuant to our Local Rule 5-3(b)(1), he has neglected to do so. The Court requests, again, that Mr. Crocker update his contact information accordingly. Failure to do so may jeopardize his entitlement to appear and represent his client in this litigation.

IT IS SO ORDERED.

Date: _____3/21/2024_____   _____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

22

Distribution:

Paul Crocker
ARMSTRONG TEASDALE LLP
2345 Grand Blvd., Suite1500
Kansas City, MO 64108

Paul M. Croker
WALLACE SAUNDERS AUSTIN BROWN & ENOCHS, chtd.
pcroker@atllp.com

Daniel A. Edelman
EDELMAN COMBS LATTURNER & GOODWIN LLC
courtecl@edcombs.com

Matthew J. Goldstein
Edelman, Combs, Latturner & Goodwin, LLC
mgoldstein@edcombs.com

Heather A. Kolbus
EDELMAN COMBS LATTURNER GOODWIN
hkolbus@edcombs.com

Offer Korin
Stoll Keenon Ogden PLLC
offer.korin@skofirm.com

Brooke Smith
Stoll Keenon Ogden PLLC
brooke.smith@skofirm.com